**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | |
|---|---|
| THE CHESAPEAKE BAY FOUNDATION, INC. *et al*., | |
| Plaintiffs, | |
| v. | Civil Action No. 8:11-cv-00047-AW |
| WEYERHAEUSER COMPANY *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

The following Plaintiffs bring this action: The Chesapeake Bay Foundation, Inc. (CBF); SmithGroup, Inc. d/b/a KCF-SHG Incorporated (SmithGroup); and Clark Construction Group, LLC f/k/a The Clark Construction Group, Inc. (Clark) (collectively "Plaintiffs"). Plaintiffs assert this breach of contract and negligence action against Defendants Weyerhaeuser Company formerly d/b/a Trus Joist MacMillan and Weyerhaeuser NR Company formerly d/b/a Trus Joist MacMillan (collectively "Weyerhaeuser"). The instant action also includes as Third-Party Defendant PermaPost Products Co. (Permapost), against whom Weyerhaeuser has asserted a Third-Party Complaint.

The following motions are presently outstanding: (1) Weyerhaeuser's Motion for Summary Judgment; (2)  Permapost's Motion for Summary Judgment Against Weyerhaeuser; (3) Weyerhaeuser's Motion for Summary Judgment Against SmithGroup; (4) Weyerhaeuser's Motion for Partial Summary Judgment Against Clark; (5) Weyerhaeuser's Motion for Summary Judgment Against CBF; (6) Weyerhaeuser's Motion for Leave to Supplement Motions for Summary Judgment Against All Plaintiffs; and (7) Permapost's Motion to Strike Certain

1

Evidence of Plaintiffs' Claims for Damages. The Parties have fully briefed the issues, and the

Court held a hearing in the instant action on March 7, 2012. For the reasons articulated herein,

the Court issues the ensuing rulings: (1) the Court **GRANTS** Weyerhaeuser's Motion for

Summary Judgment; (2) **DENIES AS MOOT** Permapost's Motion for Summary Judgment

Against Weyerhaeuser; (3) **DENIES AS MOOT** Weyerhaeuser's Motion for Summary

Judgment Against SmithGroup; (4) **DENIES AS MOOT** Weyerhaeuser's Motion for Partial

Summary Judgment Against Clark; (5) **DENIES AS MOOT** Weyerhaeuser's Motion for

Summary Judgment Against CBF; (6) **DENIES AS MOOT** Weyerhaeuser's Motion for Leave

to Supplement Motions for Summary Judgment Against All Plaintiffs; and (7) **DENIES AS**

**MOOT** Permapost's Motion to Strike Certain Evidence of Plaintiffs' Claims for Damages.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

The instant dispute traces to the construction of a "green" building on the Chesapeake

Bay called the Philip Merrill Environmental Center (Center). The Center is located in Annapolis,

Maryland and is the headquarters of Defendant The Chesapeake Bay Foundation, Inc. (CBF).

CBF is a nonprofit whose stated mission is to save the Chesapeake Bay (Bay).

CBF entered into two principal contracts in conjunction with the Center's construction.

The first contract was with Plaintiff SmithGroup, Inc. (SmithGroup). SmithGroup is an

architectural and engineering services corporation. The contract between CBF and SmithGroup

dealt with the Center's design. Doc. No. 2-2. CBF and SmithGroup entered into this contract in

August 1998. On September 27, 1999, CBF entered into a separate agreement with Plaintiff

Clark Construction Group, LLC (Clark). Doc. No. 2-1. Clark provides general contracting and

construction services.

Consistent with CBF's mission to save the Bay, the Center's construction contemplated the use of recycled and environmentally friendly materials. A significant portion of the Center consisted of glue-laminated wood members. Per the project's design, some of these wood members were exposed to the elements.

In March 2000, Clark entered into a purchase order with Defendant Weyerhaeuser. Doc. No. 2-3. Weyerhaeuser is an integrated forest products company. Under the purchase order, Weyerhaeuser agreed to provide Parallam® PSL columns and beams (Parallams) for use as the exposed wood members. Weyerhaeuser also thereby agreed to treat the Parallams with a wood preservative called PolyClear 2000. *See, e.g.*, Doc. No. 90-1 at 13 ¶ 10. The Center's construction started in late 1999 and finished in December 2000.

Shortly after the Center's construction was complete, the Center started to experience water leaks. In response, in April 2001, Clark hired a forensic engineering expert, Wiss, Janney Elster & Associates, Inc. (Wiss Janey) to survey the leaking problem. On May 8, 2001, Wiss Janey submitted a report memorializing the findings of its survey (2001 Report). One of the "primary objectives" of the 2001 Report was to "offer an opinion as to the anticipated long-term durability and performance of the facade materials, components and systems currently in service at [the Center]." Doc. No. 61-7 at 1. Pursuantly, the 2001 Report expresses the following concerns about the Parallam:

> On this project, the use of [Parallam] as an exposed element on the building facade is cause for some concern in that, a) it includes inherent irregularities at the exposed wood surfaces that, although attractive in appearance, are inherently difficult to seal; . . . and c) the wood members themselves [Parallam] do not appear to be pressure treated and in several areas also do not appear to have been

properly treated in the field with the specified wood sealer/coating. Each of these

concerns, if not properly addressed during construction, has the potential to result

in exterior wall rain water penetration and/or an accelerated rate of deterioration

of the exposed wood elements at the building facades.

*Id.* at 5.

Plaintiffs' water leak investigation continued into 2002. In May of that year, Clark

engaged Norman Vaughn, Jr. of Vaughn Woodworking Consultants (Vaughn). After inspecting

the Center, Vaughn issued a report on May 24, 2002 (2002 Report). Doc. No. 61-17. The 2002

Report notes existing damage to the Parallam:

The wood trusses and columns are moving and splitting. The movement is so

dramatic that many of the columns are distorted and are no longer flat and

smooth. The surface splits go deep into the [Parallam]. The manufacturing

technique described above has caused voids within the trusses that are visible both

on the surface and on the exposed ends. These voids run intermittently throughout

the entire length depending on the length of the lumber strands. . . .

*Id.* at 2. In its "Conclusions" section, the 2002 Report again notes existing damage to the

Parallams and states that the specified treatment and coating system failed to adequately protect

them:

The pressure-treatment along with the 3-coat finish system has failed to keep the

wood protected. The voids and splits in the Parallam have allowed the water to

enter the wood causing the wood to swell and the repeated reduction of that

humidity causing the wood to shrink. That shrinking and swelling movement has

caused cracking at the joints, the wood to warp and become out of plane at the interior column joints.

*Id.* at 3.

Plaintiffs contacted Weyerhaeuser after receiving the 2001 and 2002 Reports in furtherance of its investigation. Weyerhaeuser responded by participating in remedial efforts to stop water from intruding into the Center, such as by applying a "proprietary sealant or some kind of polyurethane product around the Parallams." Pls.' Opp'n Defs.' Mot. Summ. J. 8, Doc. No. 70 (citing Doc. No. 70-5 at 130:9–14). During this period, at least three Weyerhaeuser representatives examined the Parallams and failed to note the presence of rotting. *See id.* at 8–9 (citations omitted). Furthermore, various Weyerhaeuser representatives allegedly assured Plaintiffs that the Parallams had been properly treated and were appropriate for the project. *Id.* at 11 (citing Doc. No. 70-2 at 113:16–114:1, 245:19–256:3.); *id.* at 17–18 (citing Doc. No. 70-2 at 94–95, 142:11–143:6, 186–88, 249). Allegedly, Weyerhaeuser also rejected the concerns raised in the 2001 and 2002 Reports as "unfounded." *Id.* at 19 (citations omitted).[1] Weyerhaeuser's involvement in the remedial efforts ended no later than 2004.

Weyerhaeuser subcontracted the preservative treatment of the Parallams to Permapost Products, Inc. (Permapost). Osmose, Inc., the preservative's manufacturer, prescribed a minimum required retention of the preservative in the wood of .0525 pounds of active fungicide

---

[1] The Court omitted these citations because they do not support the proposition that Weyerhaeuser "rejected as unfounded" the concerns raised in the 2001 and 2002 Reports. For instance, one of the cited documents is a letter that Weyerhaeuser sent to Clark. Doc. No. 70-17. Therein, Weyerhaeuser acknowledges that water had infiltrated the Center and that the Parallams were "checking." The composer also writes that "I would agree with certain findings of [Wiss Janey] that . . . it may be very difficult to create a fully functional water-proof seal." *Id.* at 2. In reviewing the evidence, the Court noted comparable deficiencies in some of the evidence that Plaintiffs cite to support the contention that Weyerhaeuser assured Plaintiffs that the Parallams had been properly treated and were appropriate for the project. Be that as it may, the Court assumes the truth of these diaphanous averments by way of ruling on Weyerhaeuser's Motion for Summary Judgment.

and insecticide per cubic foot of wood treated. *Id.* (citing Doc. No. 70-27 at 3). Plaintiffs assert

that Permapost certified that it treated the Parallams to ".0525 (OTR)[2] pounds per cubic foot." *Id.*

at 11–12 (quoting Doc. No. 70-7 at 3). Nevertheless, according to Plaintiffs, Permapost treated

the Parallams to neither .0525 pounds per cubic foot nor refusal. *Id.* at 12 (citing Doc. No. 70-28

at 255; Doc. No. 70-29 at 70–72). According to Permapost's president, Jayne Bond,

Weyerhaeuser knew that Permapost failed to treat the Parallams to the manufacturer's prescribed

standard. *Id.* (citing Doc. No. 70-28 at 76–77). Evidently, Weyerhaeuser delivered Permapost's

allegedly inaccurate treatment certificate to Plaintiffs. *Id.*

Roughly half a decade passed after the above-described course of events. In 2009, during

an annual inspection, CBF allegedly discovered for the first time that the Parallams were

deteriorating.[3] Subsequently, the Parties conferred and decided to hire The Structures Group,

LLC (Structures) to assess the extent of the deterioration and whether the Parallams maintained

adequate structural capacity. Pl. CBF's Opp'n Weyerhaeuser Mot. Summ. J. Against CBF ¶ 18

(Pl. CBF's Opp'n), Doc. No. 90. In a report dated September 30, 2009, Structures recommended

removal and replacement of certain Parallams on account of deterioration. *Id.* (citing Doc. No.

90-20). Emergency repairs took place thereafter, though the Parties disputed who was

responsible therefor. Eventually, Plaintiffs executed a remediation agreement under which Clark

and SmithGroup agreed to both remediate the Center and pursue with CBF litigation against

Weyerhaeuser for the costs thereby incurred.

Correspondingly, on January 6, 2011, Plaintiffs filed a Complaint against Weyerhaeuser.

Doc. No. 2. The Complaint contains five counts. Count I, asserted by Clark against

Weyerhaeuser, is for breach of contract. Both Clark and SmithGroup assert Counts II and III

[2] OTR is a standard industry acronym for "or to refusal," connoting the point at which the wood cannot accept more preservative. *Id.* at 12 (citing Doc. No. 70-28 at 51:22–52:5).
[3] Plaintiffs use the words "rotting" and "deteriorating" interchangeably and the Court follows suit.

against Weyerhaeuser. Count II is for common law indemnity and Count III is for contribution. CBF and SmithGroup assert Counts IV and V against Weyerhaeuser. The former is for negligent misrepresentation and the latter is for negligence. Plaintiffs predicate these five Counts on two primary legal theories. First, Plaintiffs maintain that Weyerhaeuser failed to adequately treat the Parallams with PolyClear 2000. Second, Plaintiffs contend that Weyerhaeuser improperly selected PolyClear 2000 as a preservative. Plaintiffs relatedly assert that Weyerhaeuser misrepresented that it properly treated the Parallams with PolyClear 2000 and/or concealed that PolyClear 2000 was an inappropriate preservative.[4]

On January 20, 2011, Weyerhaeuser answered and counterclaimed (Counterclaim). Doc. No. 16. In its Counterclaim, Weyerhaeuser asserts claims for common law indemnity, contribution, and breach of contract. The crux of the Counterclaim is that one or more Plaintiffs acted negligently in: (1) constructing and/or maintaining the building; (2) selecting and/or approving PolyClear 2000 as a preservative; and (3) taking inadequate stock of the Center's seaside location and its foreseeable impact on the Center's structural integrity.

Contemporaneously with its Counterclaim, Weyerhaeuser filed a Third-Party Complaint against Permapost. Doc. No. 17. Therein, Weyerhaeuser asserts conditional claims for breach of contract, negligence, common law indemnity, and contribution. The Court characterizes these claims as "conditional" because, on the one hand, Weyerhaeuser denies that it is liable for any of the claims that Plaintiffs have asserted against it. Yet, on the other hand, Weyerhaeuser asserts that it could incur liability for Permapost's allegedly inadequate treatment of the Parallams. In the latter event, Weyerhaeuser contends that Permapost would be liable to it.

---

[4] In their Complaint, Plaintiffs essentially assert three categories of damages: (1) costs associated with investigating the deterioration of the Parallams and determining the proper remedial measures; (2) the cost of implementing the remedial measures; and (3) the lost revenue associated with the loss of the use of the Center during the implementation of the remedial measures.

The Parties filed answers to the Counterclaim and Third-Party Complaint and the case went into discovery. On October 3, 2011, Weyerhaeuser filed its Motion for Summary Judgment. Defs.' Mot. Summ. J., Doc. No. 61–1. The gravamen of Weyerhaeuser's Motion for Summary Judgment is that the statute of limitations started to run on Plaintiffs' claims no later than May 2002, at which time they had received both the 2001 and 2002 Reports. These Reports, according to Weyerhaeuser, put Plaintiffs on both actual and inquiry notice of their potential claims. As more than three years passed before Plaintiffs initiated the instant action, Weyerhaeuser contends that Plaintiffs' claims are time-barred.

Weyerhaeuser's Motion for Summary Judgment triggered a flurry of responsive briefs and motions. For instance, as Third-Party Defendant, Permapost filed a Motion for Summary Judgment against Third-Party Plaintiff Weyerhaeuser. Third-Party Def.'s Mot. Summ. J., Doc. No. 76. Except where otherwise indicated, the Court need not address the multitudinous attacks the Parties have mounted in these memoranda. All of the claims, counterclaims, crossclaims, and their related motions are derivative of Plaintiffs' claims against Weyerhaeuser. As the ensuing exposition elucidates, Weyerhaeuser is entitled to summary judgment against Plaintiffs' claims on limitations grounds. This disposition necessarily moots the other active motions.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate only "if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986).  The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

255 (1986)). To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Material disputes are those that "might affect the outcome of the suit under the governing law." *Id.*

Although the Court should believe the evidence of the nonmoving party and draw all justifiable inferences in his or her favor, the nonmoving party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." *See Beal v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Further, if a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). Finally, hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment. *See Greensboro Prof'l Firefighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

## III. LEGAL ANALYSIS

## A. Choice of Law

Plaintiffs' claims sound in breach of contract and negligence. The Parties do not address the appropriate law to apply to their dispute. As the Parties rely almost exclusively on Maryland law to support their arguments, they inferably presuppose that Maryland law applies to Plaintiffs' claims against Weyerhaeuser. For the reasons stated below, the Parties' presupposition is accurate.

1. *Breach of Contract*

"'A federal court sitting in diversity must apply the choice-of-law rules from the forum state.'" *Bank of America, N.A. v. Jill P. Mitchell Living Trust U/A DTD 06.07.1999*, Civil Action No. 10-CV-00857 AW, 2011 WL 5386379, at *5 (D. Md. Nov. 3, 2011) (quoting *Wells v. Liddy*, 186 F.3d 505, 521 (4th Cir. 1999)). "In deciding questions of interpretation and validity of contract provisions, Maryland courts ordinarily should apply the law of the jurisdiction where the contract was made." *Allstate Ins. Co. v. Hart*, 611 A.2d 100, 101 (Md. 1992).

In this case, the record evidence indicates that the purchase order was entered into at Clark's office in Bethesda, Maryland. The purchase order states that "[n]o other form of acceptance is binding on either Party" expect execution. Doc. No. 2-3 at 1. The purchase order also shows that Clark executed it after Weyerhaeuser, thereby "approv[ing]" it. *Id.* Accordingly, Maryland law applies to Plaintiffs' breach of contract claim.

2. *Negligence*

"Maryland continues to adhere generally to the lex loci delicti principle in tort cases." *Lab. Corp. of Am. v. Hood*, 911 A.2d 841, 845 (Md. 2006). "Under that approach, where the events giving rise to a tort action occur in more than one State, [courts] apply the [substantive] law of the State where the injury—the last event required to constitute the tort—occurred." *Id.* (citations omitted); *see also Lewis v. Waletzky*, 31 A.3d 123, 129 (Md. 2011) (citations omitted).

In this case, the record evidence indicates that the last act required for the realization of the tort occurred in Maryland. Although Permapost and/or Weyerhaeuser evidently manufactured and treated the Parallams outside of Maryland, the Parties' dispute centers on the construction of the Center, the ensuing damage to the Parallams, as well as the subsequent investigatory and remedial phases, all of which happened in Maryland. Furthermore, the

damages of which Plaintiffs complain arose in Maryland. *See Walpert, Smullian & Blumenthal, P.A. v. Katz*, 762 A.2d 582, 587 (Md. 2000) (citing cases) (noting that damages are an element of negligence claims). Accordingly, Maryland law also applies to Plaintiffs' negligence claims.

## B.    Statute of Limitations

Under Maryland law, "[a] civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced." Md. Code Ann., Cts. & Jud. Proc. § 5-101. "There being an absence of statutory direction, the question when an action accrues is left to judicial determination." *Poffenberger v. Risser*, 431 A.2d 677, 679 (Md. 1981) (citing *Harig v. Johns-Manville Prods.*, 394 A.2d 299, 302 (Md. 1978)); *see also Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 756 A.2d 963, 973 (Md. 2000) (citing cases). "[T]his determination may be solely one of law, solely one of fact or one of law and fact." *Poffenberger*, 431 A.2d at 679. Therefore, although the question of when a civil action accrues is often fact-bound, courts have not hesitated to grant motions for summary judgment on limitations grounds. *Compare Frederick*, 756 A.2d at 973 (citing *O'Hara v. Kovens*, 503 A.2d 1313 (Md. 1986)), *with Bank of N.Y. v. Sheff*, 854 A.2d 1269, 1275 (Md. 2004), *and Lumsden v. Design Tech Builders, Inc.*, 749 A.2d 796, 797, 805 (Md. 2000).

"Maryland applies the 'discovery rule' in determining when an action accrues." *Sheff*, 854 A.2d at 1275 (citing *Am. Gen. Assur. Co. v. Pappano*, 822 A.2d 1212, 1219 (Md. 2003)). Under Maryland's discovery rule, "the cause of action accrues when the claimant in fact knew or reasonably should have known of the wrong." *Lumsden*, 749 A.2d at 801 (quoting *Poffenberger*, 431 A.2d at 680). Thus, the application of the discovery rule turns on two key inquiries: (1) the

meaning of "know" or "should know"; and (2) the meaning of "wrong." The Court considers these inquiries in reverse order.

As to inquiry (2), the Maryland Court of Appeals has described the concept of "wrong" at various levels of abstraction. Consequently, while the Maryland Court of Appeals has yet to entirely explore the meaning of wrong, it has left guideposts in this quest. These guideposts occupy flexible positions on a funnel of abstraction. At the funnel's mouth, the Court of Appeals has described wrong somewhat tautologously. *See, e.g.*, *Waldman v. Rohrbaugh*, 215 A.2d 825, 826–30 (Md. 1966) (using wrong interchangeably with "injury" and "harm"), *superseded by statute*, Md. Code Ann., Cts. & Jud. Proc. § 5-109, *as recognized in Edmonds v. Cytology Servs. of Md., Inc.*, 681 A.2d 546, 551 (Md. Ct. Spec. App. 1996); *Hahn v. Claybrook*, 100 A. 83, 84 (Md. 1917) (wrongful act occurs where the plaintiff sustains an "injury"). At the funnel's center, the Court of Appeals has characterized wrong along the lines of a "cause of action" or "claim." *See, e.g.*, *Hecht v. Resolu. Trust Corp.*, 635 A.2d 394, 400 (Md. 1994)  ("The discovery rule requires that the plaintiff must have notice of a claim to start the running of limitations."); *Kovens*, 503 A.2d at 1324 (accrual of cause of action requires "knowledge . . . [that] would have led to knowledge of the alleged fraud"); *Pennwalt Corp. v. Nasios*, 550 A.2d 1155, 1159 (Md. 1988) ("[L]imitations are triggered when the plaintiff knows or should have known that he has a cause of action."). At the funnel's stem, the Court of Appeals has specified that plaintiffs must know of the "nature and cause" of the cause of action for it to accrue. *See, e.g.*, *Frederick*, 756 A.2d at 973–74 ("[B]efore an action is said to have accrued, a plaintiff must have notice of the nature and cause of his or her injury"); *Harig*, 394 A.2d at 306 ("[A] plaintiff's cause of action accrues when he ascertains . . . the nature and cause of his injury.").

This funnel of abstraction contains two added salient features. First, no matter the level of abstraction at which ones defines it, the wrong need not be absolute for the cause of action to accrue. Rather, the wrong need be only "potential" or "probable." *See, e.g.*, *Dual Inc. v. Lockheed Martin Corp.*, 857 A.2d 1095, 1104 (Md. 2004) ("the statute of limitations does not begin to accrue on a claim until the plaintiff knows or should know of the potential claim"); *Pennwalt*, 550 A.2d at 1167 (knowledge under the discovery rule means "express or implied knowledge of injury, its probable cause, and probable manufacturer wrongdoing or product defect"). Second, the funnel's contents (i.e. the guideposts and their emanations) exhibit an inexorable tendency to intermingle. *See, e.g.*, *Frederick*, 756 A.2d at 973–74; *Pennwalt*, 550 at 1167. Thus expounded, one can distill the funnel of abstraction's admixture into a more concrete definition of wrong within the context of § 5-101 and the caselaw interpreting it: knowledge of the probable cause and general nature of some manifested injury sufficient to create a colorable legal claim. *Cf.* discussion *supra* pp. 12–13.

This analysis begs the question: When does a party have such "knowledge"? A plaintiff knows or should know of the probable cause and general nature of some manifested injury sufficient to create a colorable legal claim where he has actual notice of the same. *See Poffenberger*, 431 A.2d at 680. "Actual notice may be either express or implied." *Id.* (quoting *Baltimore v. Whittington*, 27 A. 984, 985 (1893)). Express actual notice "contemplates . . . express cognition." *Poffenberger*, 431 A.2d at 681. Thus, "[e]xpress notice embraces not only knowledge, but also that which is communicated by direct information, either written or oral, from those who are cognizant of the fact communicated." *Id.* at 680 (quoting *Whittington*, 27 A. at 985). Parties establish such cognition through "direct evidence." *Id.* (quoting *Whittington*, 27 A. at 985).

By contrast, implied actual notice "arises where the party to be charged is shown to have had knowledge of such facts and circumstances as would lead him, by the exercise of due diligence, to a knowledge of the principal fact." *Poffenberger*, 431 A.2d at 680. In other words, implied actual notice contemplates "awareness implied from 'knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry (thus, charging the individual) with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued.'" *Id.* at 681 (quoting *Blondell v. Turover*, 72 A.2d 697, 699 (1950)). Parties establish such awareness "by the proof of circumstances from which it is inferable." *Id.* at 680.

In this case, a reasonable juror could only conclude that Plaintiffs had both actual and inquiry notice of their claims for more than three years before filing suit. In December 2000, shortly after the Center's construction was complete, the Center started to experience water leaks. Clark hired an expert, Wiss Janey, to examine the problem. In May 2001, Wiss Janey submitted the 2001 Report. A primary purpose of the 2001 Report was to "offer an [expert] opinion as to the anticipated long-term durability and performance of the facade materials, components and systems currently in service at [the Center]." Doc. No. 61-7 at 1. The 2001 Report unequivocally states that the Parallams "do not appear to be pressure treated and in several areas also do not appear to have been properly treated in the field with the specified wood sealer/coating." *Id.* at 5. Consistent with its purpose, the 2001 Report adds that "[e]ach of these concerns . . . has the potential to result in exterior wall rain water penetration and/or an accelerated rate of **deterioration** of the exposed wood elements at the building facades." *Id.* (emphasis added). Thus, the 2001 Report apprised Plaintiffs of (1) apparent improprieties with the treatment and coating system and (2) the potential for deterioration. At this point, at a

minimum, Plaintiffs were on inquiry notice. In other words, coupled with the leak's emergence shortly after construction,  the 2001 Report contains adequate facts to prompt a reasonable person to investigate further. As discussed below, *see* discussion *infra* pp. 16–17, 18–19, had Plaintiffs done so, they would have discovered the probable cause and general nature of the damage to the Parallams.

Plaintiffs continued their investigation into 2002 and sought the advice of a second expert, Norman Vaughn. Vaughn issued his report in May 2002. In contrast to the 2001 Report, which noted the *potential* for deterioration, the 2002 Report discusses *existing* damage to the Parallam. It states:

> The [Parallams] . . . are . . . **splitting**. . . . The surface splits go **deep** into the
> [Parallam]. The manufacturing technique . . . has caused **voids** within the
> [Parallams] that are visible . . . on the exposed ends. These voids run
> intermittently throughout the **entire length** . . . .

Doc. No. 61-17 at 2 (emphasis added). Later on, the 2002 Report again notes existing damage to the Parallams and unmistakably states that the specified treatment and coating system failed to adequately protect them: "The pressure-treatment along with the 3-coat finish system has **failed to keep the wood protected**. The **voids** and **splits** in the Parallam have allowed the water to enter the wood . . . . [As a result, the Parallams are] **cracking at the joints**." *Id.* at 3 (emphasis added).

These facts, considered in conjunction with the leak's rapid onset and the 2001 Report, lead ineluctably to the inference that Plaintiffs had actual awareness of the probable cause and general nature of the damage to the Parallams. As for causation, the following confluence of undisputed facts compels the conclusion that Plaintiffs had notice that Weyerhaeuser's

manufacturing and/or treatment process was a potential cause of the observed damage to the Parallams. First, Weyerhaeuser manufactured the Parallams and bore a contractual obligation to treat them. Second, the close temporal proximity between the Center's completion and the onset of the water leaks suggested that the Parallams—in addition to the construction and design of the building—were defective. Third, the 2001 Report apprised Plaintiffs of (1) apparent improprieties with the treatment and coating system and (2) the risk of deterioration. Fourth, similar to the 2001 Report, the 2002 Report states that the treatment and coating system failed to protect the wood and that the Parallams had deep voids and splits along their entire length that enabled water to infiltrate them with the consequence that they were warping and cracking. It also bears emphasis that experts of Plaintiffs' own choosing prepared both Reports. Apprised of these stark facts, Plaintiffs must have known that Weyerhaeuser's manufacturing and/or treatment process had gone haywire, and no reasonable juror could conclude otherwise.

For the same reasons, Plaintiffs had actual notice of the general nature of the damage. The 2001 Report explicitly states that the concerns it raised had "the potential to result in exterior wall rain water penetration and/or an accelerated rate of deterioration of the exposed wood elements at the building facades." Likewise, the 2002 Report states that the Parallams had deep voids and splits along their entire length that enabled water to infiltrate them with the consequence that they were warping and cracking. Although the Reports arguably did not apprise Plaintiffs that the Parallams were actually rotting at the time, they certainly made it clear that they had voids, cracks, splits, water penetration, and were at risk of deterioration. It goes without saying that such damage is in the nature of wood rot. Any ordinary person knows that, all else equal, wet wood rots. This ordinary person would be on notice of the potential for wood rot especially where, as here, experts of her own choosing informed her that the wood (1) was

already cracking up and (2) faced the risk of deterioration. Thus, Plaintiffs had actual notice of the nature of the harm of which they complain no later than May 2002.

Implicit in the preceding analysis is the conclusion that Plaintiffs were on inquiry notice of the potential cause and general nature of the damage to the Parallams after Wiss Janey submitted the 2001 Report. As stated above, the 2001 Report apprised Plaintiffs of (1) apparent improprieties with the treatment and coating system and (2) the potential for deterioration. At this juncture, considering the leak's rapid onset, a reasonable person would have investigated the problem further. Such investigation would have uncovered the probable cause and general nature of the damage to the Parallams. Indeed, as the preceding analysis shows, this is precisely what happened in this case. Accordingly, Plaintiffs' cause of action accrued in May 2001 (and absolutely no later than May 2002) and expired in May 2004 (and absolutely no later than May 2005).

The only remaining question is whether the above-delineated facts and circumstances created the potential for a colorable legal claim. To be sure, a reasonable juror could answer this question only in the affirmative. The question is essentially redundant with the issues of causation and the nature of the complained-of injury. In other words, the conclusion that a plaintiff has notice of the probable cause and general nature of the complained-of injury will almost invariably compel the conclusion that she can assert a potentially actionable legal claim. The reason, as explained above, is that identifying the probable cause and general nature of an injury is usually a narrower inquiry than identifying a colorable legal claim: the latter depends much more on the former than vice versa. Hence, the Court need not conduct a separate analysis concerning this issue.

The foregoing discussion demonstrates that Plaintiffs had inquiry notice of the probable cause and general nature of some manifested injury sufficient to create a colorable legal claim in May 2001. Having accrued on this date, Plaintiffs' cause of action expired three years later in May 2004. Yet Plaintiffs filed the instant action almost seven years after this date. The discussion further demonstrates that Plaintiffs had actual notice of the probable cause and general nature of some manifested injury sufficient to create a colorable legal claim in May 2002, whereupon the three-year time bomb on their cause of action started to tick. Therefore, assuming *arguendo* that Plaintiffs had no inquiry notice in 2001, their cause of action still would have exploded in May 2005. In this scenario, Plaintiffs nonetheless would have filed the instant action more than half a decade late. Accordingly, § 5-101's three-year statute of limitations has expired on Plaintiffs' claims, thereby vitiating them.

In fact, the 2001 and 2002 Reports sufficed to do more than to notify Plaintiffs of the probable cause and general nature of the complained-of injury; they sufficed to give them both actual and inquiry notice of the very legal theories underpinning their claims. Plaintiffs' first legal theory is that Weyerhaeuser failed to adequately treat the Parallams with PolyClear 2000. Not to beat a dead horse, but the 2001 Report states that the Parallams appeared to be neither properly pressured treated nor properly treated in the field. Likewise, the 2002 Report states that the treatment and coating regime failed to protect the wood. Furthermore, under the purchase order, Weyerhaeuser agreed to treat the Parallams with PolyClear 2000. Therefore, no later than 2002, Plaintiffs had notice of the exact facts underpinning one of the two principal legal theories on which they predicate their claims.

Alternatively, Plaintiffs theorize that Weyerhaeuser improperly selected PolyClear 2000 as a preservative. To reiterate, the purchase order specified PolyClear 2000 as a preservative. Yet

neither Report states that Weyerhaeuser improperly selected PolyClear (despite an express

contractual obligation to the contrary). Thus, the question is whether a reasonably diligent

investigation would have revealed that PolyClear was potentially improper. A reasonable juror

again could answer this question only affirmatively.

As Permapost details in its Motion for Summary Judgment Against Weyerhaeuser, "each

of the three wood scientists retained in this case agreed that the use of the PolyClear was

inappropriate." Third-Party Def.'s Mot. Summ. J. 11, Doc. No. 76. For instance, Plaintiffs' own

expert, Peter E. Laks, PhD, testifies that "whoever made the choice [of PolyClear 2000] made a

wrong choice because . . . right from the beginning it was clear it wasn't an appropriate

preservative to use." Doc. No. 76-2, Ex. 7 at 184. Likewise, Weyerhaeuser's expert, Craig R.

McIntyre, PhD, states that "Had I been consulted with this project prior to the construction or the

treatment, I would not have recommended [PolyClear 2000]." *Id.*, Ex. 8 at 72. Permapost's

expert, Terry L. Amburgey, PhD, expresses equivalent sentiments: "[E]very indication is that

[PolyClear] is not a biocide that will stand up under fully exposed conditions." *Id.*, Ex. 9 at 67–

68. There is no indication that some impediment prevented Plaintiffs from consulting a wood

scientist in the wake of the 2002 Report and receiving the same information. Quite the opposite,

Plaintiffs themselves contacted experts to inspect the Center incident to their investigation.

For the foregoing reasons, one must conclude that the 2001 and 2002 Reports gave

Plaintiffs both actual and inquiry notice of the precise legal theories underpinning their claims.

These observations solidify the conclusion that Plaintiffs' cause of action accrued no later than May 2002 and expired more than half a decade before they filed suit.[5]

---

[5]    Plaintiffs essentially argue that it is improper for the Court to rely on arguments Permapost makes in its Motion for Summary Judgment Against Weyerhaeuser to rule on Weyerhaeuser's Motion for Summary Judgment Against All Plaintiffs. In this connection, Plaintiffs have filed an Opposition to Weyerhaeuser's Motion for Leave to Supplement Motions for Summary Judgment Against All Plaintiffs (Opposition to Motion for Leave). Pls.' Opp'n Defs.' Mot. Leave Suppl., Doc. No. 84. In their Opposition to Motion for Leave, Plaintiffs argue that granting Weyerhaeuser leave to supplement its Motions for Summary Judgment Against All Plaintiffs would prejudice them because (1) the deadline for dispositive motions had passed when Weyerhaeuser filed its Motion for Leave and (2) the supplementation would be futile. *See id.* at 1–2.

    This argument rings hollow for several reasons. For one thing, the Court is not using the testimony of the wood scientists to buttress the arguments that Weyerhaeuser seeks to incorporate from Permapost's Motion for Summary Judgment Against Weyerhaeuser through its Motion for Leave. In its Motion for Summary Judgment Against Weyerhaeuser, Permapost makes an elaborate argument that Plaintiffs cannot establish that the allegedly improper treatment of the Parallams (i.e. not treating them to .0525 pounds per cubic foot or to refusal) caused the injuries for which Plaintiffs seek redress because all the wood scientists agree that the improper selection of PolyClear 2000 as a preservative caused the Parallams' damage. Weyerhaeuser seeks to incorporate this argument into its Motions for Summary Judgment Against All Plaintiffs because it believes that it undercuts Plaintiffs' breach of contract and negligence claims against it as well. In Weyerhaeuser's words, "any opposition to the Permapost motion . . . would require Weyerhaeuser to prove a case against itself." Mot. Leave Suppl. 2 ¶ 6, Doc. No. 83. In this Memorandum Opinion, however, the Court does not rely on Permapost's arguments to show that Plaintiffs cannot prove that the allegedly improper treatment of the Parallams caused Plaintiffs' injuries. Rather, the Court relies on a couple of pages from Permapost's brief to make the comparably mundane point that the wood scientists unanimously agree that PolyClear 2000 was not a robust preservative and that a reasonably diligent investigation would have revealed the same. Nowhere does the Court consider nuanced issues of causation as such issues are inapposite to the Court's analysis regarding the point at which Plaintiffs' cause of action accrued. [continued on next page]

Plaintiffs press two primary counterarguments. The Court has already addressed and dispatched the first above: the idea that the cause of action did not accrue until Plaintiffs actually discovered that the wood was rotting in 2009. The second is that the alleged fraud tolled the statute of limitations. Both of these arguments lack merit.

As indicated above, the notion that the cause of action failed to accrue until Plaintiffs discovered the wood rot is specious. Viewing the evidence most favorably to Plaintiffs, the Court agrees that a factual dispute exists regarding whether the 2001 and 2002 Reports notified Plaintiffs that the wood was rotting *per se*. All the same, the rot is not a standalone injury lacking a meaningful tie to the cracks, voids, splits, water penetration, and potential for deterioration that the Reports discuss. Rather, it is just the ultimate manifestation of this constellation of injuries. Thus understood, Plaintiffs' argument constitutes a thinly veiled derivation of the "maturation of the harm rule," which Maryland courts have uniformly rejected. *See, e.g.*, *Hecht*, 635 A.2d at 400 n.9 (citing cases) (noting that Maryland has "declined to adopt" "the maturation of the harm rule"); *Feldman v. Granger*, 257 A.2d 421, 425–26 (Md. 1969) (Although "the exact amount of damages sustained may not be known at the time of the discovery of the wrong[,] . . . this is not a

---

Second, in their Opposition to Motion for Leave, Plaintiffs respond to the arguments that Permapost makes in the Motion for Summary Judgment Against Weyerhaeuser that Weyerhaeuser seeks to incorporate. Therefore, assuming *arguendo* the Court relied on the precise arguments Permapost makes, Plaintiffs have already enjoyed an opportunity to respond to these arguments. Plaintiffs' Opposition to Motion for Leave is telling in this regard. Therein, as one of the legal theories underpinning their claims presupposes, Plaintiffs concede that the selection of PolyClear was improper. Pls.' Opp'n Defs.' Mot. Leave Suppl. 4, Doc. No. 84 ("[T]he claims against Weyerhaeuser are based on the fact that Weyerhaeuser knew or should have known that PolyClear 2000 was an inappropriate preservative for the project."). According to Permapost, Plaintiffs concede as much in their answers to interrogatories. Third-Party Def.'s Mot. Summ. J. 1, Doc. No. 76-1. Finally, the Court considered just one argument that Permapost makes in its Motion for Summary Judgment Against Weyerhaeuser to support only the argument that the 2001 and 2002 Reports gave Plaintiffs actual and inquiry notice of the *precise* legal theories underpinning their claims. This argument, however, is not essential to the Court's conclusion that the statute of limitations had expired long before Plaintiffs initiated the instant lawsuit. For these reasons, it is perfectly kosher for the Court to consider the argument from Permapost's Motion for Summary Against Weyerhaeuser relating to the wood scientists' unanimous agreement that PolyClear was a poor choice for a preservative.

sufficiently sound reason to postpone the accrual of the action or toll the running of limitations[.]"); *Supik v. Bodie, Nagle, Dolina, Smith & Hobbs, P.A*, 834 A.2d 170, 183 (Md. Ct. Spec. App. 2003) (alteration in original) (citation omitted) ("Maryland does not follow the maturation of harm rule"; therefore, "[a] legal wrong must be sustained, but a precise amount of damages need not be known."). Furthermore, given the fairly extensive nature of the damage the 2001 and 2002 Reports describe, one cannot dispute that, assuming the validity of their cause of action, Plaintiffs would have succeeded in proving damages. *Compare Goldstein v. Potomac Elec. Power Co.*, 404 A.2d 1064, 1069 (Md. 1979) (citation omitted) ("damages . . . must exist before the action accrues so as to trigger the running of the statute"), *with Dialist Co. v. Pulford*, 399 A.2d 1374, 1379 (Md. Ct. Spec. App. 1979) (citations omitted) ("Under ordinary circumstances the measure of damages for a breach of contract is that sum which would put plaintiff in as good a position as he would have occupied had the contract been fully performed, subject of course, to the limitations of remoteness and speculativeness."). To reiterate, just about anyone who has ever stained a deck knows that cracked, waterlogged wood stands to rot. Accordingly, the notion that Plaintiffs' cause of action did not accrue until they discovered the wood rot is unconvincing.

The contention that the alleged fraud tolled the statute of limitations is equally untenable. Plaintiffs posit that there are two types of fraud at play: (1) pre-leak and pre-Report misrepresentations that PolyClear was a proper preservative (or, alternatively, pre-leak and pre-Report concealment that it was improper); and (2) post-leak and post-Report misrepresentations that the Parallams were suitable for the job. Fraud may, in some instances, "postpone the accrual date of a cause of action." *Frederick*, 756 A.2d at 975 (citing Md. Code Ann., Cts. and Jud. Proc. § 5-203). Section 203 provides: "If the knowledge of a cause of action is kept from a party by the

fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud." Md. Code Ann., Cts. and Jud. Proc. § 5-203. In other words, fraud stops § 5-101's clock from starting where the defendant keeps knowledge of the cause of action from the plaintiff only if the plaintiff has neither actual nor inquiry notice of the fraud. *See id.*; *Frederick*, 756 A.2d at 975.

Here, the pre-leak and pre-Report allegations of fraud fail as a matter of law to toll the statute of limitations. As addressed at length herein, the 2001 and 2002 Reports alerted, or should have alerted, Plaintiffs that Weyerhaeuser's alleged certification and/or concealment that the wood was good was false. The assertion that the post-leak and post-Report representations regarding the Parallams' suitability, or lack thereof, tolled § 5-101's ticker fails for essentially the same reasons. At this point, Plaintiffs knew, or should have known, that Weyerhaeuser's alleged misrepresentations were false. Even where, unlike here, the parties share a confidential relationship, fraud fails to toll the statute of limitations "if the confiding party acquires actual knowledge during the existence of the confidential relationship that the confidential relationship has been abused, or comes into possession of facts which put him or her upon inquiry notice." *Frederick*, 756 A.2d at 976.

Plaintiffs insist that a handful of holdings dictate a contrary result. *See* Pls.' Opp'n Defs.' Mot. Summ. J. 17–20, Doc. No. 70. Only one of the cases Plaintiffs discuss is controlling. *See Baysinger v. Schmid Products Co.*, 514 A.2d 1 (Md. 1986). The *Baysinger* court held that the Court of Special Appeals erred in affirming the trial judge's decision to grant the defendant's motion for summary judgment on limitations grounds. *Id.* at 1–2. The acts leading to the dispute in *Baysinger* started in May 1979, when the plaintiff (Baysinger) had an intrauterine contraceptive device inserted at a family planning clinic. *Id.* at 2. Baysinger began to experience

abdominal pain in November 1979, whereupon Dr. Gallaher removed the device. *Id.* Dr. Gallaher had no idea what was causing Baysinger's illness. *Id.* at 4. In late December 1979, Baysinger was hospitalized for the same illness, whereupon Dr. Cho, Dr. Gallaher's associate, assumed her care. *Id.* Dr. Cho told Baysinger that there was "no way of determining" the cause of her infection. *Id.* During this period, Baysinger entertained suspicions that the device had caused her infection. *Id.* Baysinger filed suit against the device's manufacturer in January 1984. *Id.* at 2.

The trial court held that Baysinger's cause of action accrued in December 1979. *Id.* at 3. At this time, the trial court determined that "at least some suspicion existed on her part that her problems might be related to the . . . device." *Id.* (internal quotation marks omitted). The Court of Special Appeals summarily affirmed and the Court of Appeals reversed. *Id.* at 1–2. The *Baysinger* court characterized the factual record as "sparse" and concluded that reasonable minds could differ about whether Baysinger was on inquiry notice. *See id.* at 4. In coming to this conclusion, the Court emphasized the role Dr. Cho played in dissuading her from investigating her suspicions. *See id.* The Court also attached weight to Dr. Gallaher's assertion that one could not determine the cause of Baysinger's illness, inferring therefrom that "further investigation by way of inquiry of Dr. Gallaher would have been fruitless." *See id.*

One can readily distinguish this case from *Baysinger*. Whereas Baysinger sought the advice of doctors who cared for her, Plaintiffs engaged two independent experts to investigate their concerns about the Parallams. In marked contrast to Dr. Cho's self-serving remark that there was "no way of determining" the cause of her infection, the neutral 2001 and 2002 Reports pinpoint the pressure treatment and coating system as a source of the observed problems, including the risk of rot and the warping and cracking of the beams. Furthermore, unlike in

*Baysinger*, "further investigation by way of inquiry" would have borne fruit. The preceding analysis shows that the 2001 and 2002 Reports put Plaintiffs on actual and inquiry notice of (1) the probable cause and general nature of some manifested injury sufficient to create a colorable legal claim and (2) the precise legal theories underpinning their claims.

Plaintiffs essentially respond that Weyerhaeuser—not a wood scientist or some other expert—is to Plaintiffs what Dr. Cho is to Baysinger. One cannot, however, reconcile this response with the observation that the physician/patient relationship is utterly unalike the relationship between cosmopolitan commercial counterparts. *See, e.g.*, *infra* p. 26. Despite repeatedly professing that they relied on Weyerhaeuser and its expertise in the area of wood products, Plaintiffs have failed to present any authority proposing that a confidential relationship exists between commercial actors who bargain at arm's length. Quite the contrary, where arm's-length parties are concerned, one party's self-serving denial of liability is usually inadequate to excuse the other's decision to slumber on its rights. *See Lumsden*, 749 A.2d at 805 (citation omitted). For these reasons, *Baysinger* is inapposite[6] and a reasonable jury could only conclude that Plaintiffs' allegations of fraud are insufficient to toll the statute of limitations.

Although dispensable to the Court's disposition, a few final remarks regarding policy are in order. "Statutes of limitations have existed in Maryland and in other common law jurisdictions for hundreds of years." *Lumsden*, 749 A.2d at 799 (citing William D. Ferguson, The Statutes of Limitation Saving Statutes 12–14 (1978)). Consistent with this time-honored tradition, the Maryland legislature enacted § 5-101 "to balance the competing interests of potential plaintiffs, potential defendants, and the public." *Id.* That is, § 5-101's limitations period "represents a compromise of these interests and 'reflects a policy decision regarding what constitutes an

---

[6] The Court declines to distinguish the other cases Plaintiffs cite because (1) they are not controlling and (2) to do so would only belabor the point.

adequate period of time for a person of ordinary diligence to pursue his claim.'" *Id.* (quoting

*Goldstein*, 404 A.2d at 1069). Thus, § 5-101 is "designed to (1) provide adequate time for

diligent plaintiffs to file suit, (2) grant repose to defendants when plaintiffs have tarried for an

unreasonable period of time, and (3) serve society by promoting judicial economy." *Id.* at 800

(citing *Pierce v. Johns-Manville Sales Corp.*, 464 A.2d 1020, 1026 (1983)). "In making a

determination as to when the statute of limitations accrues in a particular circumstance, a court

must do so 'with awareness of the policy considerations unique to each situation.'" *Doe v.

Archdio. of Wash.*, 689 A.2d 634, 639 (Md. Ct. Spec. App. 1997) (quoting *Hecht*, 635 A.2d at

401). Courts likewise must mind Maryland's "long . . . rule of strict construction concerning the

tolling of the statute of limitations." *Hecht*, 635 A.2d at 399.

     Although the plaintiff's interest in access to the courts and the defendant's interest in

repose often counterbalance, this balance tips in favor of Weyerhaeuser in view of this case's

undisputed facts. Unlike many of the cases in which the discovery rule took root, this case does

not involve a relationship of trust between a weaker and a stronger party. *See Pennwalt*, 550

A.2d at 1157–59. Nor does it implicate any paramount policy concern, such as public health. *See

id.* at 1159 (citing *Harig*, 394 A.2d 299). Instead, it is a relatively insular dispute between

sophisticated commercial entities. Yet the defendant has an undeniable interest in repose in cases

where, as here, the undisputed evidence overwhelmingly establishes that the plaintiff's cause of

action has been on full display for years. *See Feldman*, 257 A.2d at 426 ("The primary

consideration underlying such legislation is undoubtedly one of fairness to the defendant. There

comes a time when he ought to be secure in his reasonable expectation that the slate has been

wiped clean of ancient obligations . . . .").

This imbalance in interests grows more lopsided when one factors in the interest of judicial economy. Plaintiffs initiated this lawsuit nearly ten years after the 2001 Report and more than half a decade after § 5-101 timed out. Although Plaintiffs have capably championed their cause, it is safe to presume that, considering this cavernous temporal chasm, "evidence has been lost, memories have faded, and witnesses have disappeared." *Id.* (citation and internal quotation marks omitted). Accordingly, the policy considerations unique to this case bolster the Court's decision to grant Weyerhaeuser's Motion for Summary Judgment.

Granting Weyerhaeuser's Motion for Summary Judgment disposes of the entire case. The various claims and associated motions that the Parties have asserted are derivative of Weyerhaeuser's liability. As Weyerhaeuser is not liable, these claims lack viability. Consequently, the Court denies as moot all the other outstanding motions.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Weyerhaeuser's Motion for Summary Judgment. A separate Order follows.

|  |  |
|---|---|
| March 23, 2012 | /s/ |
| Date | Alexander Williams, Jr. |
|  | United States District Judge |